**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Shilo C.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 20 C 7797** |
| | ) | |
| **KILOLO KIJAZAKI,** | ) | **Judge Rebecca R. Pallmeyer** |
| **Acting Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Shilo C. appeals the Social Security Administration's denial of her claim for Social Security disability insurance benefits. For the reasons discussed below, Defendant's motion for summary judgment upholding the denial is denied, and the court remands the decision for further review.

<u>**BACKGROUND**</u>

On February 1, 2018, Shilo C. ("Plaintiff") applied for disability insurance benefits, alleging disability as of March 28, 2017. (Administrative Record [12] ("R.") at 189.) On the alleged disability date, Plaintiff was 41 years old and had at least a high school education. (R. 27.) She claimed several impairments, including lumbar degenerative disc disease with post-laminectomy syndrome, fibromyalgia, generalized anxiety disorder, adjustment disorder, and post-traumatic stress disorder. (*See, e.g.*, R. 216, 228, 234, 247.) The Social Security Administration ("SSA") denied the claim on July 19, 2018 (R. 86), and again upon reconsideration on January 18, 2019 (R. 106–07). Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which was held on January 30, 2020. (*See* R. 39–75.)

---

[1] In accordance with this district's Internal Operating Procedure 22, the court refers to Plaintiff only by her first name and the first initial of her last name.

ALJ Roxanne Kelsey issued a written decision on April 29, 2020, finding that Plaintiff was not disabled under the Social Security Act. (R. 16–28.) Judge Kelsey considered a range of evidence, including Plaintiff's medical records, reports from various psychologists and medical experts, Plaintiff's testimony, and that of the vocational expert ("VE"). (R. 18–28.) The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision the final decision of the Commissioner. This court has jurisdiction pursuant to 42 U.S.C. § 405(g).

## I.      Documentary Evidence

The record contains several years of medical records detailing Plaintiff's physical and mental health.

### A.      Medical Records

Since at least March 1, 2016, Plaintiff has been treated by Dr. Jnnaemeka Onwuta, a physician specializing in pain management. (*See* R. 362.) On that day, Dr. Onwuta diagnosed Plaintiff with cervical radiculopathy, fibromyalgia, complex regional pain syndrome ("CRPS")[2], and lumbosacral radiculopathy. (*Id.*)

On February 21, 2017, Plaintiff visited Dr. Richard Rabinowitz at Barrington Orthopedic Specialists for her neck and lumbar spine pain. (R. 319–24.) Dr. Rabinowitz noted that Plaintiff had a normal gait, negative straight leg raising and full motor strength in the upper and lower extremities, but reduced range of motion in the lumbar spine. (R. 321–22.) An X-ray showed an intact prior fusion in the lumbar spine at L3 through S1, although there was a marked disc loss height at L2-L3. (*Id.*) Because Plaintiff was suffering from cervicalgia (neck pain) and lower back pain, Dr. Rabinowitz prescribed pain medication and referred her to a physical therapist.[3] (R. 328–29.)

---

[2]     Complex region pain syndrome is a broad term describing excess and prolonged pain and inflammation that follows an injury to an arm or leg. *See* https://www.ninds. nih.gov/health-information/disorders/complex-regional-pain-syndrome.

[3]     Cervicalgia is defined as the presence of pain in the neck region, and can radiate to the shoulders, upper limbs or back. https://pubmed.ncbi.nlm.nih.gov/24315079/.

After her appointment with Dr. Rabinowitz, Plaintiff continued seeing Dr. Onwuta for pain management.  She began taking Suboxone[4] on September 26, 2017 (R. 337), and, during a follow-up appointment on October 24, 2017, she informed Dr. Onwuta that the medication helped alleviate some of the chronic pain throughout her body.  (R. 332.)  But the medication did not provide total relief: that same day, Dr. Onwuta's examination of Plaintiff's spine revealed "tenderness," "pain [] elicited by motion," and several other "abnormalities."  (R. 334.)

On January 9, 2018, Plaintiff saw her primary care physician, Dr. Nabanita Bhowmick, and complained of severe back pain.  (R. 455–58.)  Dr. Bhowmick gave Plaintiff a full physical exam and found tenderness in the lumbar spine, but no other abnormalities.  (R. 457.)  Three months later, on April 6, 2018, Plaintiff saw another physician, Dr. Viswanatham Susarla, who noted that Plaintiff made the appointment because she was looking for a new primary physician, was not sleeping well, and wanted help to quit smoking.  (R. 510.)  Dr. Susarla's notes further show that Plaintiff had fibromyalgia but made no mention of any physical abnormalities during the examination that day, or in a follow-up on June 7, 2018.  (R. 508–11.)  Plaintiff also underwent surgery in May 2018 for uterine fibroids and a hysterectomy in September 2018.  (R. 487-93, 653.)  Dr. Stephen Gladdin, who performed the surgeries, did not note any complications from either procedure in the medical record.

On May 22, 2018, in conjunction with her application for disability benefits, Plaintiff visited Dr. Margaret Grano for a consultative exam.  (R. 494–96.)  Dr. Grano noted that Plaintiff wore a large back brace and had a "slightly stooped posture," but was "able to move easily and briskly around the room."  (R. 496.)  As her "clinical impression," Dr. Grano noted that Plaintiff suffered from (1) "fibromyalgia with multiple positive trigger points and consistent comorbid conditions"; (2)

---

[4]  Suboxone (also known as Buprenorphine) is a medication approved by the Food and Drug Administration (FDA) primarily to treat Opioid Use Disorder, but it is also commonly used for chronic pain relief.  *See* https://www.samhsa.gov/medication-assisted-treatment/ medications-counseling-related-conditions/buprenorphine.

"degenerative arthritis of the spine"; and (3) "chronic regional pain syndrome of the lower extremity." (R. 498.) Dr. Grano prepared a statement in which she confirmed that Plaintiff was able to "sit, stand, walk, lift, carry, hear, and speak" but had the following limitations: (1) "[M]ild limitation of the fine movement of the left hand," (2) inability to lift or carry greater than 10 pounds, (3) inability to climb a ladder, and (4) inability to walk or stand for prolonged periods of time. (*Id.*)

After this exam, on July 10, 2018, Plaintiff returned to her pain management specialist, Dr. Onwuta, complaining again of back, hip, knee, and leg pain. (R. 406.) She also reported swelling in her left leg, and had full motor strength except for weakness in that leg. (R. 406, 408.) Dr. Onwuta's notes—the last ones in the record from this doctor—refer to several ongoing medical issues: cervical radiculopathy, degenerative disc disease, fibromyalgia, post-laminectomy syndrome, sacroiliac joint dysfunction, and lumbosacral radiculopathy. (R. 407.)

In connection with this application for benefits, Plaintiff saw state agency providers who conducted assessments of her mental and physical health in June and July 2018. (R. 76.) Dr. David Voss found psychological limitations in functioning were "related to [Plaintiff's] medical/physical condition and any mental impairment would impose no more than mild limitation in functioning and is considered non-severe." (R. 82.) Dr. Calixto Aquino concluded that Plaintiff is not disabled, but is limited to a light level of activity as a result of pain associated with "multiple masses in the endometrium." (R. 86.) Dr. Aquino observed that Plaintiff was "able to move easily and briskly around the room while situating her belongings," had a normal gait, had a "slightly stooped posture," and was not in acute distress. (R. 85.) Dr. Aquino also reported that Plaintiff had moderate difficulty squeezing the blood pressure pump, and mild difficulty opening doorknobs, picking up coins, and general grip strength; but he was also concerned that Plaintiff made a "poor effort." (*Id.*) Except for poor grip strength, Dr. Aquino reported that Plaintiff's motor strength and range of motion was intact. (*Id.*)

On November 10, 2018, Plaintiff again visited Dr. Susarla, who sent Plaintiff for an MRI after she reported that, while the medication helped with her pain, she was still experiencing

numbness in her lower extremities. (R. 641.) The MRI, conducted on November 19, 2018, showed that her previous spinal fusion was intact, but there was mild central canal stenosis at L2-L3. (R. 635.) When she next saw Dr. Susarla on January 15, 2019, the doctor noted Plaintiff's history of spinal fusion with subsequent complications that included nerve root compression with bilateral radiculopathy and numbness/tingling and weakness in the lower extremities. (R. 632.) Dr. Susarla also noted that Plaintiff was scheduled to see a spinal neurosurgeon in February 2019 and would "get a subsequent in-house referral to Rush pain clinic." (Id.)

In addition to these scheduled visits with care providers, Plaintiff has visited the emergency room a number of times since the alleged onset date. In November 2018, she began visiting the emergency room with greater frequency. For example, she was treated at Advocate Sherman Hospital on November 13, 2018 for "all over body pain" and discharged with instructions to take prescribed medication, review her muscle relaxer prescription with a pain management specialist, continue getting lab tests, and "return for any new or worsening symptoms." (R. 703, 705.) Plaintiff was seen in the ER again on December 17, 2018 for a urinary tract infection (R. 735) and on January 28, 2019 for chronic "lumbar back pain." (R. 836.) Despite her ailments, Plaintiff retained full motor strength, a normal gait, and intact sensations during these visits. (See, e.g., id.) The ER physician noted that treatment with Morphine, Valium ,and Toradol "did decrease the pain and make it 'more tolerable'."[5] (Id.)

Plaintiff underwent another disability assessment between October 2018 and January 2019, this time with state care providers, whose conclusions were similar to those reached earlier by Drs. Voss and Aquino. (R. 89.) Like Dr. Voss, Dr. Larry Kravitz performed a mental evaluation and concluded that while Plaintiff's mental signs and symptoms did impact her functioning, she was primarily limited by her pain-related physical limitations. (R. 102.) Dr. Douglas Chang

---

[5]    Toradol (also known as Ketorolac) is an injection used for the short-term relief of moderately severe pain in people who are at least 17 years of age. *See* https://medlineplus.gov/druginfo/meds/a614011.html.
.

concluded, as did Dr. Aquino, that Plaintiff had a physical Residual Functional Capacity ("RFC") determination of "not disabled," but could only be expected to sustain a light level of activity due to pain associated with masses in the endometrium. (R. 104.) Dr. Chang observed "some decrease on the lumbar extension and a scar over the lower lumbar spine, some increased sensation over the entire left side of the body, and a positive Tinel's sign[6]" on the same side. (R. 104.) He also noted that Plaintiff appeared incapacitated by her symptoms, noting that she had "difficulty getting on and off the exam table, heel walking, toe walking, and squatting." (*Id.*)

Plaintiff also visited Dr. Debbie Weiss for a consultative exam for the Bureau of Disability Determination Services on February 9, 2019. Dr. Weiss's notes are nearly identical to Dr. Chang's: Dr. Weiss observed that Plaintiff exhibited a decreased range of motion in the lumbar spine, full motor strength, a slow gait, and a slightly reduced grip strength. (R. 558–62.) Dr. Weiss identified fibromyalgia and complex regional pain syndrome as "problem[s]" for Plaintiff, and, like Dr. Chang, wrote that Plaintiff "seemed fairly incapacitated by her symptoms" and "had difficulty getting on and off the exam table, heel walking, toe walking, [and] squatting." (R. 561.)

On May 28 and July 17, 2019, Plaintiff returned to the emergency room at Advocate Sherman Hospital with various complaints, including generalized body pain, and increased pain exacerbated by hot weather. (R. 847–900.) On August 5, 2019, Plaintiff was admitted to the hospital for back pain and, according to the admission note, "suboxone weaning."[7] (R. 769.) Six days later, she was discharged with no symptoms of withdrawal, a mildly antalgic gait (a limp), full motor strength, and normal range of motion in the lumbar spine. (*See* R. 767–68.) Plaintiff returned to the Advocate Sherman Hospital emergency room twice more, on November 5, 2019 and November 26, 2019, with similar complaints of back pain. (R. 901-958.)

---

[6]      Tinel's sign is a tingling sensation that a patient gets when their skin is tapped over an affected nerve. *See* https://my.clevelandclinic.org/health/diagnostics/22662-tinels-sign.

[7]      Suboxone can also be addictive in nature and withdrawal symptoms may arise if the user stops taking the medication. See https://americanaddictioncenters.org/suboxone /addictive.

After her stay at the hospital, Plaintiff saw Dr. Susarla twice more for primary care.  At a November 15, 2019 examination, Dr. Susarla noted no physical abnormalities, but concluded that Plaintiff continued to suffer from fibromyalgia, radiculopathy in the lumbar region, complex regional pain syndrome, and fusion of the spine.  (R. 624–25.)  On a December 5, 2019 visit, Dr. Susarla again made no note of physical abnormalities and updated his physical assessment to account for Plaintiff's complex regional pain syndrome.  (R. 622.)

### B.    Psychiatric Records

Plaintiff has a history of anxiety, depression, and post-traumatic stress disorder and has received some professional treatment for these problems.

On May 22, 2018, Plaintiff visited clinical psychologist Dr. Michael Stone for a psychiatric consultative examination for the Bureau of Disability Determination Services.   (R. 500–06.) During the consultative examination, Plaintiff reported that she experienced anxiety and panic attacks.  Dr. Stone noted that she was irritated and anxious but also that her thought content and processes were appropriate, and her memory was intact.  (*Id.*)  Dr. Stone diagnosed Plaintiff as suffering from generalized anxiety disorder and adjustment disorder.[8]  (R. 505.)

Other doctors also took note of Plaintiff's mental health challenges.   During an appointment with Dr. Susarla on June 7, 2018, Plaintiff complained of depression, high stress, anxiety, and insomnia.  (R. 508.)  At Plaintiff's request, Dr. Susarla prescribed Zoloft (R. 509), but even after more than two months on that medication, she remained depressed.  (R. 543.)  At some point—the record is not clear when—Dr. Susarla referred Plaintiff to a psychiatrist named Dr. Abrams who started Plaintiff on Buspirone, an anti-anxiety medication.   (R. 641.) On November 11, 2018, Plaintiff told Dr. Susarla that the Buspirone was helping with anxiety and insomnia; on January 15, 2019, she reported that "she had worsening depression over the

---

[8]        Adjustment disorder is "a state of subjective distress and emotional disturbance, which arises during the course of adapting to stresses of significant life changes, stressful life events, serious physical illness, or possibility of serious illness."  *See* https://www.ncbi. nlm.nih.gov/pmc/articles/PMC3701359/.

holidays, but her symptoms are improving and are currently controlled." (R. 632.) On March 22, 2019, in a follow-up appointment with Dr. Susarla, Plaintiff complained of sleep disturbances, low energy level, depressed mood, and anxiety. (R. 629.) She reported discontinuing Buspirone and stated that a psychiatrist had prescribed Adderall for ADHD symptoms, which resulted in "some improvement," though Plaintiff "continue[d] to have occasional low mood and insomnia." (*Id.*) Dr. Jayarama Naidu, a psychiatrist, apparently prescribed Adderall[9] on February 5, 2019, doubled the Adderall dosage on March 5, 2019, prescribed Methylphenidate on March 22, 2019, and added Vyvanse[10] to Plaintiff's regimen on June 25, 2019. (R. 971.)

On October 11, 2019, Plaintiff was admitted to Amita Hospital in Elgin, Illinois "due to depression and psychosis." (R. 576.) Hospital records note that Plaintiff was "hearing voices" and "making a number of nonsensical statements." (*Id.*) She remained in the hospital for ten days, during which time she began taking new psychiatric medications and attending group therapy sessions. (*Id.*) As of October 20, 2019, Dr. Anwar Syed, an emergency room physician, described Plaintiff as "still very isolative and withdrawn" and noted that her judgment seemed limited. (R. 592.) As part of the "Problem List" in his progress notes, Dr. Syed wrote that Plaintiff suffered from post-traumatic stress disorder (along with major depressive disorder and alcohol abuse.)[11] (*Id.*) Plaintiff nevertheless left the hospital less depressed and less anxious, denied hallucinations, and was "eager for discharge." (*Id.*)

On November 15, 2019, Plaintiff reported to Dr. Susarla that she had stopped taking several of her medications due to side effects. At Plaintiff's request, Dr. Susarla renewed her

---

[9]     Adderall and Methylphenidate are prescription stimulants that are generally used to treat attention-deficit hyperactivity disorder (ADHD) and narcolepsy. *See* https://nida .nih.gov/publications/drugfacts/prescription-stimulants.

[10]     Vyvanse is also used to control symptoms of ADHD. *See* https://medlineplus. gov/druginfo/meds/a607047.html.

[11]     The record remains silent on what traumatic event caused her to develop post-traumatic stress disorder.

8

Zoloft prescription. (R. 624–25.) Most recently, according to the record, Plaintiff followed up with Dr. Susarla on December 5, 2019. (R. 622.) At that appointment, Plaintiff reported that she continued to experience feelings of depression or hopelessness, and Dr. Susarla continued her Zoloft prescription. (*Id.*)

On January 10, 2020, Licensed Clinical Psychologist Patricia A. Merriman, Ph.D., completed a mental functional capacity statement on Plaintiff's behalf. (R. 960.) Dr. Merriman stated that she had seen Plaintiff during eleven visits since March 29, 2019 and that in Dr. Merriman's opinion, Plaintiff "probably" could no longer work as of March 28, 2017 (the alleged onset date). (*Id.*)

## II.    Administrative Hearing

On January 30, 2020, the ALJ held an administrative hearing, attended by Plaintiff, her representative, and a vocational expert.

### A.    Plaintiff's Testimony

At the administrative hearing, Plaintiff testified that since May 2017, the alleged onset day of disability, she had not maintained consistent employment. (R. 42–43.) For example, she worked briefly as a server at Tracy's, a gambling café, for two to three months; but because she experienced "a lot of pain" paired with a lack of sleep, it became difficult for her to continue working. (R. 43-44.) Plaintiff generally worked shifts that were shorter than eight hours and nevertheless struggled with attendance due to her daily chronic pain and insomnia. (R. 44–45.) Plaintiff would call off from work frequently because her legs were swelling and walking was difficult. (R. 45.) The ALJ asked Plaintiff about the source of the leg swelling; Plaintiff was unsure about the origin but suggested changes in weather and medication as factors. (R. 46–47.) Plaintiff also stated that the swelling occurred regardless of her activity level, which had been low in recent days because of the pain she experienced. (*Id.*)

Regarding daily activities, Plaintiff reported that she lives with her boyfriend who works full time, and that she is responsible for some "light" chores around the house, such as dusting,

sweeping, and mopping. (R. 48.) Plaintiff stated she also shops for groceries and house supplies when her pain levels allow it, but otherwise relies on delivery services. (*Id.*) Plaintiff is able to drive, but cooking has recently become more difficult. (*Id.*) Plaintiff's hobbies include reading and watching television, but she has not engaged in them recently because of her anxiety and depression. Plaintiff does not use a cellphone or computer and noted that when reading, she sometimes struggles to follow the narrative. (R. 50.) Plaintiff flew to Las Vegas to celebrate her daughter's first wedding anniversary during summer 2020; she reported having problems flying because of the long periods of sitting and, for medical rather than recreational reasons, she had to rent a motorized scooter to move around the city. (R. 49.)

Plaintiff testified that she routinely suffered side effects of "severe swelling," insomnia, and grinding her teeth due to her medication (she did not identify the medications that caused these side effects). (R. 51–52.) During what Plaintiff described as "the horrific period," she switched medications and suffered "complete disassociation" as a side effect. (R. 52.) Plaintiff testified that her doctors then switched medications again, but the new medications caused side effects she described as "clicking going on in her head to where nothing made sense." (*Id.*) Plaintiff testified that she and all of her doctors "missed [her] nerve medication," and after she resumed taking that (unidentified) medication, her mental state drastically improved. She reported that the day before the hearing, a doctor changed her medications again and that she already noticed improvements. (*Id.*)

At the time of the hearing, Plaintiff was still experiencing pain, which she tried to relieve through physical therapy in both warm and cool environments, heat and ice massages, and other home-based remedies. (R. 53.) Plaintiff testified that she had struggled to find psychological assistance since 2007 before beginning treatment with Dr. Patricia Merriman. (R. 55, 963.) Concerning her physical abilities, Plaintiff reported that she can no longer lift ten pounds repeatedly, and that her pain flared whenever she lifted anything "a little heavy." (R. 56.) She

reported that she can stand for approximately thirty minutes to an hour before needing to readjust and can walk a block or two, but not without a limp.  (R. 56–57.)

### B.    Plaintiff's Representative

Plaintiff provided additional information in response to questions asked by her representative:  Plaintiff testified that she could no longer perform a job she had held in the past because that work required her to be seated on a stool to see over the counter and help customers—which would cause pain in her spine. (R. 58.)  As a result of pain caused by complex regional pain syndrome and by fibromyalgia, Plaintiff stated that she has difficulty climbing stairs, is easily fatigued, and needs to utilize the railing to pull herself up.  (*Id.*)  When asked by her representative if she has any sensitivity to noise, Plaintiff stated that for five or six months leading up to the hearing, she experienced sensitivity to noises that had not troubled her previously.  (*Id.*) For example, during the hearing, Plaintiff was bothered by the ALJ's mouse clicking and by the humming of the heater in the hearing room.  (R. 59.)  Additionally, Plaintiff offered the example of car engines as a noise that at one point did not disturb her but that she now finds bothersome. (*Id.*)  She attributes her unemployment to her inability to attend work reliably and consistently due to her chronic pain, difficulty with comprehension, and other medical issues.  (R. 59–60.)

### C.    Vocational Expert

Julie Bose, a vocational expert ("VE"), testified at the hearing.  (R. 60.)  Bose noted Plaintiff's prior employment history as an owner and manager of a real estate company, an account service manager, and a showroom consultant at a plumbing store before her alleged disability date.  (R. 62.)  The ALJ concluded, as Plaintiff's representative claimed, that while Plaintiff's work at the real estate company and as an account service manager qualified as substantial gainful activity, her work as a showroom consultant did not because Plaintiff's earnings in that position fell below the threshold required for substantial gainful activity.  (R. 64.)

Past relevant work will be identified either as the claimant actually performed it or as the work is generally performed in the national economy and recognized in the Dictionary of

Occupational Titles used by the Social Security Administration (the "DOT").[12]  Jobs that are directly named and align with the description in the DOT are considered "performed and recognized."  (R. 65.)  Jobs that do not directly correspond with a titled occupation and its corresponding description are only considered "performed"; employment that is labeled as "performed" is then approximated to similar jobs within the DOT, when possible.  The VE analogized Plaintiff's work as an account service manager to that of "customer service manager," the closest occupation in the DOT.  (R. 64.)  The VE consolidated Plaintiff's work at the real estate company and at the plumbing store into one DOT classification of "Receptionist".[13]  (R. 64–65.)  The ALJ then examined the VE, posing multiple hypothetical scenarios in relation to the jobs that did rise to the level of substantial gainful activity.

First, the ALJ posed a hypothetical younger person with greater than a high school education who could perform "light work as described by the regulations with occasional climbing of ladders, ropes or scaffolds, frequent climbing of ramps of stairs and may frequently perform fine or gross manipulation with either upper extremity."  (R. 65.)  The VE determined that such a person could perform the work Plaintiff had previously performed.  (*Id.*)

The second hypothetical asked whether an individual could instead perform sedentary work, as defined by the regulations, if the person could "frequently but not consistently use the left dominant hand for fine movements and cannot climb ladders."  (R. 65.)  The VE determined that the DOT would allow for the receptionist position to be both performed and recognized by the DOT, and the customer service manager position could be performed, though not recognized, as sedentary under the DOT's definition.  (*Id.*)

---

[12]     *See* Social Security Administration, Vocational Expert Handbook (June 2020), https://www.ssa.gov/appeals/public_experts/Vocational_Experts_(VE)_Handbook-508.pdf,     at 18.

[13]     Plaintiff testified that she shared ownership with her ex-husband and managed the real estate company.  Plaintiff testified that her work in that role primarily consisted of answering phones, scheduling appointments, and filing paperwork.

The third hypothetical added a further restriction: the need to use a cane for standing or walking. (R. 67.) With that restriction, the VE determined that both the receptionist and customer service manager jobs would be reduced to a sedentary classification and consequently would be regarded as performed, but not recognized, under the DOT. (*Id.*)

The ALJ's fourth hypothetical, used in conjunction with the earlier ones, considered a person who "lack[ed] the ability to carry out complex instructions because of moderate limitations in concentration but retain[ed] the sustained concentration necessary for simple work of a routine type." (R. 67–68.) The VE offered a variety of answers about the type of work that someone of this nature would be capable of, ranging from "light, unskilled work" to "sedentary, unskilled" positions. (R. 68.)

The ALJ's final hypothetical was intended to recognize Dr. Merriman's assessment and Plaintiff's self-reported symptoms. In this hypothetical, the individual

> would be off task more than 30 percent of the day, needs normal workplace breaks, meaning two 15 [minute] breaks after two hours of work and a 30-minute break mid shift. Would be absent seven or more days per month because of her symptoms, no fast paced work, such as an assembly line work or work with high production quotas, would be 40 percent slower than the average worker, may occasionally work in coordination with proximity to others, because of moderate difficulties in social functioning may only engage in brief contact with supervisors, should not be required to travel to unfamiliar places or to use a public transportation as part of the job, should not be expected to set goals or make plans independently of other, [with] no other limitations.

(R. 69–70.) The VE replied that these hypothetical circumstances would rule out work altogether. (R. 70.)

### III. ALJ Opinion

#### A. Overview

In her April 29, 2020 decision, the ALJ found Plaintiff not disabled. (R. 17.) In reaching that conclusion, the ALJ adhered to the familiar five-step sequential evaluation. *See* 20 C.F.R. § 404 § 1520(a). Step one asks whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(b). At step two, the ALJ determines whether the claimant has a medically

determinable impairment or a combination of impairments that is severe. 20 C.F.R. § 404.1520(c). At step three, the ALJ considers whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(d), 404.1525, and 404.1526.

Before addressing step four of the sequential evaluation process, the ALJ determines the claimant's RFC—that is, the individual's ability to perform physical and mental work activities on a sustained basis despite limitations from any impairments, including impairments that are not severe. 20 C.F.R. § 404.1520(e); *see also* 20 C.F.R. § 404.1545; SSR 96-8p. Then, at step four, the ALJ is called upon to determine whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. § 404.1529(f). Finally, at step five, the ALJ determines whether the claimant is able to do any other work considering her RFC, age, education, and work experience. 20 C.F.R. § 404.1520(g). An applicant who cannot perform any other work is considered disabled and entitled to disability benefits. 20 C.F.R. §§ 404.1520(g), 416.920(g).

At the first three steps, the ALJ's analysis was straightforward: First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 28, 2017, the alleged disability onset date. (R. 18.) Second, the ALJ found that Plaintiff had severe impairments of lumbar degenerative disc disease with post-laminectomy syndrome, fibromyalgia, generalized anxiety disorder, adjustment disorder, and post-traumatic stress disorder. (R. 19.) The ALJ additionally acknowledged Plaintiff's surgeries for uterine fibroids in May and September 2018—a condition not deemed severe because the operating surgeon reported no complications, and because there was no evidence of resulting functional limitation lasting at least 12 months. (*Id.*) Third, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). (*Id.*)

At the fourth step, the ALJ determined that Plaintiff had the RFC to perform "light work" as defined in 20 C.F.R. § 404.1567(b) and can also occasionally climb ladders, ropes, or scaffolding,

and can frequently climb ramps and stairs. (R. 21.) The ALJ determined that she is also able frequently to perform fine or gross manipulation with either hand. Due to moderate limitations in concentration, the ALJ determined that Plaintiff retains the sustained concentration necessary for simple work of a routine type, but is not able to carry out complex instructions and therefore is unable to perform past relevant work as a customer service manager or receptionist.

Finally, however, at step five, she found that Plaintiff can perform jobs that exist in the natural economy, including office helper, order caller, or mail sorter. (R. 28.) As a result, the ALJ concluded that Plaintiff was not disabled.

### B. RFC Determination

In this case, the parties dispute the reasonableness of the ALJ's RFC determination. In making that determination, the ALJ used a two-step process. (R. 21.) The ALJ considered (1) whether there is an underlying medically determinable physical or mental impairment(s) that could be reasonably expected to produce Plaintiff's pain or other symptoms; and (2) whether the intensity, persistence, and limiting effects of Plaintiff's symptoms in fact limit Plaintiff's work-related activities. (*Id*.) The ALJ stated that she considered all symptoms and the extent to which these symptoms can reasonably be understood as consistent with the objective medical evidence and other evidence based on the requirements of 20 C.F.R. § 404.1529 and SSR 16-3p. The ALJ also stated that she considered the medical opinion(s) and prior administrative finding(s) in accordance with the requirements of 20 C.F.R. § 404.1520(c). (*Id.*)

The ALJ noted Plaintiff's belief that she is unable to work due to chronic pain, but did not find that Plaintiff's testimony on this score convincing; in the ALJ's view, Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." (R. 22.) The ALJ observed that while the record showed that Plaintiff had difficulties related to her physical impairments, she remained capable of "a reduced range of light exertion." (R. 24.) Although the medical record demonstrated that Plaintiff had lumbar degenerative disc disease, with a history

of fusion and resultant complex regional pain syndrome, in addition to fibromyalgia, the ALJ noted that records show that Plaintiff nonetheless had intact motor strength and was able to walk without difficulty. (*Id.*) The ALJ made no mention of Dr. Susarla's observation that Plaintiff may need to use a wheelchair during pain flare-ups, or of evidence that Plaintiff was observed using a cane at times. (R. 629, 632, 633.)

The ALJ also reviewed the medical opinions, relevant psychiatric history, and prior administrative medical findings in the record, and noted the determinations of state agency consultants, Dr. Aquino and Dr. Chang, that Plaintiff could perform light exertion with no more than frequent fine and gross manipulation. (R. 24.) In the ALJ's view, the objective evidence established that Plaintiff did not have significant difficulties ambulating or manipulating objects. (*Id.*) The ALJ cited statements made by Dr. Grano and Dr. Weiss as providing additional support for those conclusions--though those doctors reported that Plaintiff had mild to moderate difficulty manipulating objects with her left hand (R. 497), could not walk or stand for prolonged periods (R. 498), and "had moderate difficulty with heel walk and toe walk." (R. 560.)

With respect to Plaintiff's manipulative limitations, the ALJ agreed with Dr. Grano's findings, but rejected Dr. Grano's assessment of Plaintiff's standing and walking abilities as too vague. (R. 24.) As the ALJ viewed the medical records, they are instead consistent with a limitation to light exertion, and do not support Dr. Grano's determination that Plaintiff can lift no more than 10 pounds, as other evidence consistently showed full motor strength in the upper extremities and only a slightly reduced grip strength. (*Id.*)

The ALJ's findings regarding Plaintiff's psychological conditions are somewhat inconsistent. The ALJ noted that Plaintiff has a history of anxiety, depression, and post-traumatic stress disorder, and had received only "sporadic treatment" for those issues but nevertheless had maintained "good control" of her conditions. (R. 25.) Taking Plaintiff's psychiatric history into consideration, the ALJ concluded that Plaintiff's anxiety, affective disorder, and post-traumatic stress disorder, in addition to chronic pain from fibromyalgia, do result in a moderate limitation in

16

concentrating, persisting, or maintaining pace. (*Id.*) Accordingly, the ALJ determined that Plaintiff is not able to carry out complex instructions but can "perform simple work of a routine type." (*Id.*)

The ALJ referred specifically to records concerning Plaintiff's psychiatric impairments as well. (R. 26.) Again, the ALJ's conclusions are not wholly consistent. State agency consultants Dr. Voss and Dr. Kravitz both determined that the claimant's psychiatric impairments were not severe, but the ALJ found their opinions inconsistent with the objective evidence, consultative examination, and Dr. Susarla's notes, all of which identified Plaintiff's psychiatric impairments as severe. (*Id.*) The ALJ also disagreed with findings of Dr. Stone, the consultative examiner, that Plaintiff had "'fair' abilities to relate to others; to understand, remember, and follow simple directions; maintain attention; and to withstand the pressures of day-to-day work activity." (*Id.*) Dr. Stone's opinions were, in the ALJ's view, "vague and not expressed in vocationally relevant terms." (*Id.*)

Though the ALJ thus concluded Dr. Voss and Dr. Kravitz had improperly minimized Plaintiff's mental health challenges, the ALJ was also unmoved by Dr. Merriman's RFC opinion that Plaintiff was likely to be off task more than 30% of a typical workday because of anxiety and chronic pain.[14] That assessment was unpersuasive, in the ALJ's view, because Dr. Merriman "is a pain management physician and not a psychiatrist" whose treatment notes were not in the record. (R. 26.) The ALJ concluded that, apart from the evidence of Plaintiff's hospitalization in October 2019, the psychiatric record did not support Dr. Merriman's assessment that Plaintiff's anxiety and chronic pain would cause excessive absenteeism. (*Id.*) The ALJ thus concluded that "[Plaintiff's] mental status was generally intact, she denied depressive symptoms, and she stated that medication helped." (*Id.*) Another source that the ALJ deemed not useful was a third-party function report prepared by Plaintiff's mother, who stated that Plaintiff was in chronic pain and

---

[14] The ALJ misquotes Dr. Merriman as having estimated the amount of time Plaintiff will spend off task as more than 25%; in fact, Dr. Merriman stated that Plaintiff would be off task more than 30% of the time. (*See* R. 26.)

often distracted.  The mother is not, in the ALJ's view, an acceptable source under Social Security rules and her statement is "not entirely consistent with the objective evidence."  (R. 26.)

In the end, while acknowledging that Plaintiff suffers from physical and psychiatric conditions, the ALJ concluded that Plaintiff retains the residual functional capacity to perform light work with the limitations described above. (R. 21, 26.)

### C.    ALJ's Conclusion

Having determined Plaintiff's RFC, the ALJ concluded that Plaintiff was unable to perform any past relevant work but considering her age, education, work experience, and RFC, there are jobs in the national economy that she could perform.  (R. 27.)  The ALJ found that Plaintiff is able to make successful adjustments to perform other work that exists in the national economy and is therefore not disabled under §§ 216(i) and 223(d) of the Social Security Act and.  (R. 28.)

## DISCUSSION

Plaintiff has appealed from the Commissioner's decision, challenging the Social Security Administration's authority to act at all, and challenging the ALJ's determinations.   The court addresses the arguments in turn.

## I.    Commissioner's Authority / Separation of Powers

Plaintiff's initial challenge requires only brief discussion.  Plaintiff contends, specifically, that the Social Security Administration lacked power to issue a decision on her case because Andrew Saul's role as Acting Commissioner of the Social Security Administration at the time of the ruling constituted a violation of the separation of powers.  In *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183, 2197 (2020), the Supreme Court held that "the CFPB's leadership by a single individual removable only for inefficiency, neglect, or malfeasance violates the separation of powers."  The SSA, like the CFPB, is headed by a single Commissioner "[who] may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance." 42 U.S.C. § 902(a)(3).   *Seila* does not, however, support Plaintiff's claim here; though the removal provisions for the Director of the CFPB and the Commissioner of the SSA are

similar, *Seila* expressly noted a distinction: "[U]nlike the CFPB, the SSA lacks the authority to bring enforcement actions against private parties . . . . [and] [i]ts role is largely limited to adjudicating claims for Social Security benefits." 140 S.Ct. at 2202.

In any event, as explained in *Collins v. Yellen*, 141 S.Ct. 1761 (2021), a party challenging agency action as a separation of powers violation must "show how the unconstitutional provision actually harmed the party—for example, id the President would have removed the agency's head but for the provision, or alternatively, if the agency's head 'might have altered his behavior in a way that would have benefitted' the party." *Kaufmann v. Kijakazi*, 32 F.4th 843, 849 (9th Cir. 2022) (quoting *Collins*, 141 S. Ct. at 1789). In recent cases, several other courts in this Circuit have found that claimants for Social Security disability benefits have not made such a showing. *Lizette C. v. Kijakazi*, No. 21 C 3517, 2022 WL 3369274, at 1-2* (N.D. Ill. Aug. 16, 2022); *Cheryl T. v. Kijakazi*, No. 20 C 6960, 2022 WL 3716080, at 4-5* (N.D. Ill. Aug. 29, 2022); *Michele S. v. Kijakazi*, No. 21 C 1764, 2022 WL 4465833, at 5* (N.D. Ill. Sept. 26, 2022). Nor has Plaintiff done so in this case. *Carr v. Saul*, 141 S.Ct. 1352 (2021), cited by Plaintiff, does not bolster her argument on this score because in *Carr*, the Court considered whether petitioners had forfeited their Appointments Clause challenges by failing to make them first to their respective ALJs. *Id.* at 1356. The Court did not address whether a new hearing is required where there was no showing that any improper delegation of authority resulted in the denial of benefits. This court concludes that the separation of powers doctrine does not entitle Plaintiff to a rehearing of her claim before a new ALJ.

## II.    The ALJ's Mental RFC Determination Was Not Supported by Substantial Evidence.

Plaintiff's challenge to the ALJ's RFC determination requires more substantial discussion. The court will remand the ALJ's decision if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence. *Albert v. Kijakazi*, 34 F.4th 611 (7th Cir. 2022) (citing *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020)). The substantial evidence requirement mandates that the ALJ identify "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). Even if some record evidence supports the ALJ's decision, it is not upheld unless the ALJ builds an "accurate and logical bridge" between the evidence and the conclusion. *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020) (quoting *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001)). The court itself will not take on the work of building a logical bridge for the ALJ, *Mason v. Colvin*, 13 CV 2993, 2014 WL 5475480, at *6-7 (N.D. Ill. Oct. 29, 2014), and if the court finds that the ALJ erred, it will remand the case unless it can predict "with great confidence" that the result on remand will not change. *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011).

A claimant's RFC is the ability to carry out physical or mental work activities on a sustained basis despite limitations from any impairments, 20 C.F.R. § 404.1545(a)(1), and is determined "based on all the claimant's impairments and all the relevant evidence in the record." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009). A claimant's RFC is a legal determination reserved for the Commissioner, but courts have emphasized that the ALJ is not free to "play doctor," or to interpret "new and potentially decisive medical evidence" without input from a medical professional. *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018) (citing *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014)). Generally speaking, "ALJs should not attempt to analyze the significance of medical findings without input from an expert." *Gibbons v. Saul*, 801 F. App'x 411, 417 (7th Cir. 2020). Accordingly, the ALJ's RFC assessment should not rest on "her own lay opinions" that could "fill evidentiary gaps in the record." *Suide v. Astrue*, 371 F. App'x 684, 690 (7th Cir. 2010).

### A. The ALJ's Evaluation of Plaintiff's Mental RFC

Plaintiff contends that the ALJ improperly evaluated her mental RFC by relying on the ALJ's lay judgment rather than the medical opinions. In several cases cited by Plaintiff, the Seventh Circuit has instructed that, to comply with Social Security Ruling ("SSR") 96-8p, ALJs must cite specific medical facts in support of the RFC assessment. *See, e.g.*, *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 352 (7th Cir. 2005); *Suide v. Astrue*, 371 F. App'x at 689–90; *Bates*

*v. Colvin*, 636 F.3d 1093, 1101 (7th Cir. 2013). Plaintiff takes particular issue with the ALJ's statement that "the evidence supports a limitation to simple, routine work but not greater restrictions." (Pl.'s Br. at 5 (citing R. 26).) That statement, Plaintiff argues, does not adequately address Plaintiff's difficulties with concentration, persistence, and pace. These issues are important, according to Plaintiff, because the VE testified that if Plaintiff was off task for greater than 30% of the day (as Dr. Merriman opined), that would "rule out work all together." (R. 69.) Plaintiff argues that the ALJ "made no off task finding," and thus effectively assumed that Plaintiff could be on task 100% of the time without suffering a lapse in concentration—a finding unsupported by evidence in the record. (Pl.'s Br. at 6 (citing, e.g., *Winsted v. Berryhill*, 923 F.472, 478 (7th Cir. 2019); *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019).)

In responding to this argument, the Commissioner correctly notes that the ALJ is responsible for resolving evidentiary conflicts. (Def.'s Br. at 3 (citing *Pepper v. Colvin*, 712 F.3d 351, 363 (7th Cir. 2013).) The court is less certain that the ALJ did so properly here. The ALJ's conclusion does not address Plaintiff's limitations in concentration, persistence, and pace in any careful way, and does not consider the impacts of those limitations on her abilities to perform even simple work consistently. The Seventh Circuit has repeatedly stated the importance of considering all of the limitations supported by the claimant's medical record, including moderate limitations in concentration, persistence, or pace. *Crump*, 932 F.3d at 570 (citing *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015)); *see also Saul*, 950 F.3d at 373–74 (stating that "[s]omeone with problems concentrating may not be able to complete a task consistently over the course of a workday, no matter how simple it may be."). In this case, the ALJ took multiple medical opinions into consideration but did not explain how she arrived at her RFC determination based upon these opinions, Plaintiff's testimony, and Plaintiff's medical history. While the ALJ need not use "magic words" to make an RFC assessment, remand is still called for when the assessment fails to "incorporate[] all of the claimant's limitations supported by the medical record." *Weber v. Kijakazi*, No. 20 C 2990, 2021 WL 3671235, at *5 (7th Cir. Aug. 19, 2021) (citation omitted); *cf. Tommie S.*

*v. Kijakazi*, No. 19 C 8249, 2021 WL 5232728, at *3 (N.D. Ill. Nov. 10, 2021) (noting that an ALJ's use of boilerplate language alone does not necessitate remand so long as the RFC is reflective of all limitations in the record).

Defendant emphasizes that the ALJ has discretion to make determinations about which medical opinions are most significant. *Wilson v. Berryhill*, 737 F. App'x 286, 290 (7th Cir. 2018) ("An ALJ has substantial discretion regarding which doctor to believe…and the ALJ gave suitable reasons for acting within that discretion here"). Defendant argues, further, that this court should uphold all but the most patently erroneous reasons for discounting a physician's assessment. *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015). Again, the court agrees that an ALJ is entitled to discount one medical opinion in favor of others, but the ALJ must explain the reasons for doing so, thus building a logical bridge between the evidence, as she has weighed it, and her conclusions. Here, having disregarded Dr. Merriman's opinion, the ALJ was left with mental health opinions she had discounted in part and no opinion that clearly supports the RFC determination she ultimately made. Significantly, the ALJ posed a hypothetical question to the VE that incorporated documented struggles with concentration and limitations recognized by Dr. Merriman—being "off-task" 30% of the time, and missing six days of work each month. The VE concluded those limitations would render Plaintiff incapable of working. Yet the ALJ's ultimate finding appears to conclude that Plaintiff is in fact capable of remaining on task for 100% of the time and is not prone to absenteeism.

Defendant cites cases where this court found that it "quizzical" for the claimant to challenge the ALJ's failure to rely on medical opinions in assessing the claimant's RFC. *Karla J.B. v. Saul*, No. 19 C 50019, 2020 WL 3050220, at *3 (N.D. Ill. Jun. 8, 2020); *Patrick C. v. Saul*, No. 20 C 608, 2020 WL 6287370, at *8 (N.D. Ill. Oct. 27, 2020).) In both of those cases, unlike this one, the ALJ's assumptions favored the claimant—meaning that the claimant's challenge to those assumptions made little sense. In this case, by contrast, the ALJ *discounted* Dr. Merriman's

opinion, which was more favorable to Plaintiff than the ALJ's ultimate finding assessment, without offering a logical bridge supported in the administrative record.

### B. The ALJ's Failure to Identify Dr. Merriman's Role

Plaintiff contends that the ALJ mischaracterized Dr. Merriman as a pain management physician; her actual role is that of Plaintiff's clinical psychologist at a pain management center. The distinction is likely unimportant in some circumstances; here, however, Dr. Merriman's opinion appears to be the only opinion of record that speaks to the interconnection between Plaintiff's physical and mental impairments. As Plaintiff argues, the Seventh Circuit has counseled that a holistic approach is superior to a reductionist analysis that does not account for potential interplay between Plaintiff's ailments. *Childress v. Colvin,* 845 F.3d 789, 792 (7th Cir. 2017) ("The administrative law judge seems not to have realized that Childress's treating physicians considered *all* his problems in combination . . . . That is the correct approach.") (emphasis in original); *Goins v. Colvin*, 764 F.3d 677, 681 (7th Cir. 2014) ("We keep telling the Social Security Administration's administrative law judges that they have to consider an applicant's medical problems in combination."); SSR 96-8p ("The RFC considers functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments").

Defendant argues that the ALJ acted properly in discounting Dr. Merriman's assessment. Defendant notes, first, that Dr. Merriman's treatment notes were not included in the record. *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007) (stating that a represented claimant is "presumed to have made his best case before the ALJ"). In support of the argument that the failure to provide treatment notes justifies rejection of Dr. Merriman's opinion, the Commissioner cites decisions in which the administrative record was incomplete, and the claimant made no effort to alert the ALJ of outstanding records. *James G. v. Saul*, No. 18 C 4794, 2019 WL 4305518, at *9 (N.D. Ill. Sept. 11, 2019); *Jacobs v. Saul*, No. 20 C 409, 2021 WL 1153284, at *3 (E.D. Wisc. Mar. 26, 2021). Instead, in the cited cases, the ALJ had asked the claimants whether the record

was complete, and the claimants assured that it was. In this case, in contrast, Plaintiff alerted the ALJ at the administrative hearing that there were outstanding medical records that Plaintiff's counsel was attempting to retrieve. (R. 42.)

Next, Defendant argues that the ALJ properly discounted Dr. Merriman's opinion because that opinion did not account for evidence that on some occasions, Plaintiff had normal mental status examinations and improvement in her symptoms. *McFadden v. Berryhill*, 721 F.App'x 501, 505 (7th Cir. 2018) ("The ALJ reasonably demanded from [the treating physician] some explanation for finding limitations so much more severe than those recognized by other doctors, and she was entitled to discount his [unexplained checkbox] opinion for not providing that explanation"). This argument may have merit, but it is undeveloped in this context; the ALJ did not explain which parts of Dr. Merriman's opinion she found unsupported by the record, and instead selectively cited medical records stating that Plaintiff's mental status was intact, that she denied depressive symptoms, and that medication helped relieve her symptoms. (R. 26.) The ALJ referred to Plaintiff's psychiatric treatment as "sporadic," but that observation is not accurate with respect to Dr. Merriman, who saw Plaintiff some 11 times over the course of the year prior to the hearing. The absence from this record of Dr. Merriman's treatment notes is troubling, but the court is more troubled by the ALJ's failure to explain fully how Dr. Merriman's assessment was inconsistent with the record as a whole, or to engage fully with Plaintiff's psychiatric history.

This case is a close one; the Commissioner is correct that the ALJ was permitted to rely upon opinions she deemed more supported. *Hapner v. Saul*, 818 F.App'x 552, 556 (7th Cir. 2020) ("When, as here, there are qualified medical opinions on both sides of an issue, it is the agency's job to decide which one to credit"). And it is ordinarily the ALJ's responsibility to weigh, accept, and reject evidence in the record. On this record, however, the court finds the ALJ's reasons for doing so unclear, particularly in light of the ALJ's own recognition that the doctors whose opinion she ultimately credited had understated the severity of Plaintiff's mental health challenges. In this context, the ALJ's characterization of Dr. Merriman as a physician with a pain management

24

specialty may be significant.  As noted, Dr. Merriman, a clinical psychologist who specializes in pain management and treated Plaintiff for several months between March 2019 and January 2020, was best positioned to address the interplay between Plaintiff's physical and psychological impairment.  The ALJ's apparent misstatement concerning Dr. Merriman's role suggests the ALJ may not properly have assessed the weight to be given to Dr. Merriman's opinion.  *See Mckinsey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011) (stating that a non-examining opinion does not carry as much weight as a treating specialist).  Dr. Merriman had specific insight on how Plaintiff's mental health struggles interacted with her physical problems.  If the ALJ found Dr. Merriman's opinion unpersuasive, the ALJ should have explained this on grounds other than a mistaken assessment of her expertise.

The ALJ's mischaracterization of Dr. Merriman's role on its face appears to be a relatively minor factual mistake but, in this case, may have had a direct impact on the outcome.  As the Seventh Circuit recognizes, factual errors can be a basis for reversal.  *Sarchet v. Chater*, 78 F.3d 305, 308-309 (7th Cir. 1996) ("The system of judicial review reposes substantial discretion in the first-line tribunal with regard to issues of fact and the application of law to fact.  When the decision of that tribunal on matters of fact is unreliable because of serious mistakes or omissions, the reviewing court must reverse."); *Myles v. Astrue*, 582 F.3d 672, 676 (7th Cir. 2009) (case remanded when ALJ's basis for determination on an issue was a mistake of fact); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006) (ALJs commit reversible error when their determination is grounded in "errors of fact or logic").  Remand is therefore justified here.

### C.    The Court Declines to Address Plaintiff's Physical Conditions

The parties raise additional arguments that the court declines to address at this time.  For example, Plaintiff argues that the ALJ erred in properly evaluating her severe medically determinable impairment of post-laminectomy syndrome and erred when evaluating her subjective allegations.  There may well be merit to these claims, but the court need not address them.  This case will be remanded for further proceedings.

**CONCLUSION**

For the reasons set forth above, the court reverses the ALJ's decision and remands for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g). The Commissioner's motion for summary judgment [24] is denied. Civil case terminated without prejudice.

ENTER:

Dated:  March 31, 2023

_____
REBECCA R. PALLMEYER
United States District Judge